UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GAIGE ANTHONY WHITE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-03298** |
| **FLOYD BROOKS, ET AL.** | **SECTION "E" (4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and submit proposed findings and recommendations for disposition pursuant to **28 U.S.C. § 636(b)(1)(B) and (C), §1915e(2), and § 1915A**, and as applicable **42 U.S.C. § 1997e(c)(1) and (2)**. The magistrate judge conducted a *Spears* hearing in which Plaintiff was allowed to further explain his claims in the nature of an amended complaint. *See Adams v. Hansen*, 906 F.2d 192, 194 (5th Cir. 1990) ("Spears hearing is . . . in the nature of an amended complaint or a more definite statement.").

**I.   Factual and Procedural Background**

    **A.   Original Complaint**

Plaintiff, Gaige Anthony White, a white transgender inmate aka "Khloe Kay White" ("White") is a convicted inmate housed in the B. B. "Sixty" Rayburn Correctional Center ("RCC"). White filed this complaint *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983 on December 2, 2020 alleging that the prison officials were deliberately indifferent to his serious mental and health needs when he sought help, but was denied hormone therapy treatment because of his alleged gender dysphoria[1]. Rec. Doc. 1.

---

[1]   The American Psychiatric Association ("APA") goes further and defines "gender dysphoria" as a marked incongruence between one's experienced/expressed gender and assigned gender of at least six (6) months duration, as manifested by at least two of six factors: (1) a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics; (2) a strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender; (3) a strong desire for the primary and/or secondary sex characteristics

White alleges that on August 28, 2020, he stopped Sgt. Marshall Crosby ("Sgt. Crosby") and Lt. Jeremy Boone ("Lt. Boone") to notified them that he had gender dysphoria because he was transgender. He also informed them that he was thinking about harming himself by self-mutilation because he is a female, not male. He alleges that these prison officials refused to help him and instead walked off. He further alleges that the prison surveillance tape of that day would show that he made a "suicide gesture" and he was then placed in Sleet 4 by Sgt. Crosby and Lt. Boone on the orders of Major Terry Kennedy ("Major Kennedy"). While in Sleet 4, White cut his penis with a piece of metal. He alleges that he attempted self-mutilation because he is a woman, not a man.

After the incident, White alleges that he was taken to the infirmary by Lt. Boone and Lt. Larry Weary in full body restraints. He alleges that while being brought to the infirmary, these officials threatened him with bodily harm and stated, "you gay ass little b**ch you going to stop acting up or we going to f**k you up". He alleges that Lt. Boone then hit him in the back of the head twice. Rec. Doc. 18.

White alleges that after his attempt self-mutilation, he was seen and treated in the infirmary by Nurse Stringer and Jenkins. According to White when he got to the infirmary Major Kennedy wanted to take photos of his condition, but Nurse Stringer and Jenkins denied his request until they removed the blood from his penis. After he left the infirmary, he was brought back to the unit where he sat bleeding. He alleges that Dr. Robert Cleveland ("Dr. Cleveland") was notified and

---

of the other gender; (4) a strong desire to be of the other gender (or some alternative gender different from one's assigned gender); (5) a strong desire to be treated as other gender (or some alternative gender different from one's assigned gender); and (6) a strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender). *Clark v. LeBlanc*, No. CV31900512BAJRLB, 2019 WL 5085425 (M.D. La. Oct. 10, 2019). See also Diagnostic and Statistical Manual of Mental Disorders ("DSM-5). The APA further notes that the condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning. Id.

gave instruction to place him on extreme suicide watch with four-point restraints, arm grippers, and a helmet with straps. *Id.*

White admits that he was non-compliant when he was returned to Sleet-4 when he began pulling the bandages off his penis which caused blood to go everywhere in the shower. When Boone saw what White did, White alleges that Boone replied, "get that son-of-a-b**ch out of the shower and place him in the lobby before I kill his ass".

After White was pulling at his bandage, mittens were placed on him, Nurse Stringer then allegedly checked the restraints. As a result of this incident, White was placed on "extreme suicide lock down" and was confined to the bed for over 14 days. He contends that the metal he used to cut on his penis caused him to become infected. *Id.* Additionally, according to White, the nurses did not do their job and during the 14-day period he was confined to the bed, he was only allowed to clean his penis twice. *Id.* He contends that he was advised by medical that he would not get treated because he did this to himself and would now have to deal with it. *Id.*

White also alleges that while in Sleet 4 he observed another inmate, James Rosier ("Rosier"), get gassed with a chemical agent while restrained. According to White, Rosier was then restrained and placed in the shower, and while there he hung himself. White alleges that he told Major Kennedy that Rosier was hanging himself and he replied, "f**k that son-of-b***h let him hang." He alleges that by the time they attended to Rosier who hung himself, that White had been bleeding for two and a half hours. According to White, Rosier was thereafter seen by medical and placed in an extreme suicide watch with four-point grippers and a helmet with straps per the order of Dr. Robert Cleveland. White alleges that he was retaliated against when they placed him in a twenty-two (22) strap restraint.

White alleges that on September 2, 2020 he made several self-declare emergencies ("SDE") and each time he was seen by Nurse Stringer. He alleges that he notified her that he was

getting an infection, and she did not reply. He alleges the last time he made an SDE, Sgt. Crosby came in the shower and threatened him with bodily harm when he said, "You aren't getting shit right now until Lt. Boone gets through eating. Until that time comes, get the f**k back before we beat the fu*k out of you". According to White, Sgt. Crosby also stated, "how fun it would be to see me get fucked over and how before the night was up that they were going to beat my ass". Thereafter according to White, Sgt. Crosby left, and Lt. Boone came with a wheelchair and took him to the infirmary while threatening and hitting him in the back of his head at least two or three times.

White alleges that when he arrived at the infirmary, he was seen by Nurse Stringer and she and Lt. Boone both denied him medical treatment, made him get out the wheelchair and walk back to Sleet unit 4-R. He alleges that the whole time he walked back to the unit both Lt. Weary and Lt. Boone hit him over and over until he got to the unit. *Id*.

White alleges that when he arrived at his cell, he got aluminum foil that he had at the bottom of the bars, swallowed them whole. Id. He alleges that based on what he did, Nurse Stringer should have sent him outside for a "trip emergency" but she did not do so which according to White was retaliation. Instead, he was placed on extreme suicide with four (4) point restraints and grippers, a helmet with straps per orders of Dr. Robert Cleveland. *Id*. He again alleges that the fact that he was placed on extreme suicide watch by Nurse Stringer, Lt. Boone and Dr. Cleveland was retaliation.

White contends that he was harassed and retaliated against by the C-team when he was told, "you cut yourself and that is on your body." *Id*. He alleges that even though he cut his arms, neck, and penis that he did not get a Rule Violation 19 for engaging in self-mutilation. *Id*. Instead White alleges that he received a Rule 1 and 17 violation for wearing female clothing which he

4

alleges is evidence of retaliation; a point which is contradicted by other documents in the record. *Id*.

White thereafter filed suit against five RCC officials involved in either receiving his complaints or providing medical treatment to him after his attempted self-mutilation. Rec. Doc. 1, p. 4. White named as defendants; Paula Stringer and Austin Seals, both nurses at RCC, Assistant Warden/Mental Health Director Floyd Brooks ("Director Brooks"), Dr. Robert Cleveland, the prison medical doctor and, Graham Spruiell, a psychiatrist. *Id*. He seeks punitive and compensatory damages for his physical and mental health. *See* Rec. Doc. 1.

White alleges that the prison officials are not taking him seriously even despite his attempted mutilation because he no longer wants a penis. *Id*. White complains that the fact he tried to cut off his penis indicates that he is not in his right mind because what inmate would want to cut off their penis because they don't want "it" no more.

White alleges that he has serious mental health issues including mental health dysphoria and a really strong desire to rid himself of his sexual characteristics and he is being denied hormone treatment despite this fact by the prison medical providers. *Id*. White alleges that the failure to provide him with "mental treatment" constitutes discrimination.

    **B.**   **Amended Complaint.**

On June 11, 2021, White filed an Amended Complaint against Floyd Brooks, Dr. Robert Cleveland, Dr. Graham Spruiell, Nurses Paula Springer and Austin Seale. Rec. Doc. 18. In the amended complaint White alleges that the defendants acted with deliberate indifference to his serious medical or mental health needs because they knew he suffered with ADHD, Bipolar Disorder, Gender Identity Dysphoria, and PTSD.

White alleges that he is being singled out and rejected for hormone treatment because he is a white transgender. *Id*. He contends that he is being discriminated against because of his race

(White) since two African American inmates (Joseph Boatner and Wilbert Williams) were provided with hormone therapy while he was denied hormone therapy in violation of his Right to Equal Protection. *Id*.

White also alleges that he tried to solve the problem by filing a grievance on August 28, 2020 which was denied on September 28, 2020, which he appealed two days later. *Id*. at. p. 4. He alleges that the Louisiana Department of Corrections was deliberately indifferent in violation of the Eight Amendment and engaged in cruel and unusual punishment by denying him proper access to medical care. White contends that he will suffer irreparable harm unless the court grants him declaratory and injunctive relief. In addition, he also seeks compensatory and punitive damages, hormone treatment and costs along with other equitable relief as the court deems appropriate. Rec. Doc. 18-5. White also seeks an order enjoining the defendants from retaliating against him because he filed this civil suit. *Id.* at. p. 8.

White attached several exhibits to his Amended Complaint which generally detail his attempts to communicate with the defendants regarding his transgender status. He, according to the documents, began communicating with prison officials in 2017 and continued through February 2021. His communications were with Dr. Cleveland, Director Brooks, Warden Kelly Cynthia Crain, the PREA compliance manager, and others to no avail.

### C.  The *Spears* Hearing

On May 12, 2021, the Court held a *Spears* hearing. White testified that he was convicted of a home invasion and for beating up a man who he believes wrongly touched his niece. He beat the man so severely that he was in a coma for three months. White testified that he has twenty (20) months left in jail. White further testified that he has mental health issues including bi-polar

disorder, depression, post-traumatic stress disorder, borderline personality disorder, and adult attention deficit hyperactive disorder (ADHD) and has been in and out of the hospital all of his life.

White testifies that he has been on extended lockdown for three years because he does not feel comfortable around other people and he desires to be by himself. White testified that he has had suicidal thoughts and thoughts about harming himself since May 2020. In fact, White testified that he continues to try to harm himself because in his mind he is a girl. White testifies he believes that he has gender dysphoria, but Dr. Brooks prepared an opinion indicating that White does not have gender dysphoria.

White acknowledged that he came into the jail as a male because he was afraid to identify as female. However, he later decided to declare that he is a transgender female. White testified that after arriving at RCC he started engaging in homosexual relationships which really started to "let the girl come out." He testified that he is referred to as Khloe Kay in the prison. He confirmed that since age nine he would wear his sister's clothing while at home. He testified that he would like to be mentally stable and does not want to go out in the world one day as a man and the next day as a girl.

White testified therefore that he is seeking to have the prison provide him with hormone therapy to help him transition properly into becoming a girl. White testifies that the hormone treatment he is asking to receive will help him become less angry about having male body parts and will allow him to live with male body parts although he is a female.

White testified that he named Nurse Paula Stringer and Nurse Austin Seals in his original complaint because they both denied him the ability to change his bandage for 14 consecutive days. White also testified that he named Floyd Brooks in his complaint because he was not giving him the medical help that he needed even though Brooks confirmed that White was not in his right

7

mind. White testified that he named Dr. Graham Spruiell because he was the doctor that evaluated him and verbally told him that he had gender dysphoria but in the written report declared that he did not have gender dysphoria. In addition, White testified that Dr. Spruiell lied stating he would give White hormone treatment, but on the First Step Response form stated that White does not have a gender dysphoria. White further testified that because of Dr. Spuiell's analysis and belief that he does not have gender dysphoria he is not on the transgender tier at RCC.

As a result of his failed efforts at securing treatment, White testified that he has repeatedly tried to harm himself because in his mind, he is a girl but when he looks down he is still male. He further acknowledged that he was being placed on a transgender intersex treatment plan which according to counsel for the defendant is a plan for a person who has either male and female organs or characteristics. White testified that while he was placed on the plan and signed some papers to that effect, that he has not received any "treatment".

White testified that he seeks estrogen hormone treatment while incarcerated. He testified that if he was provided hormone treatment then he would be able to help accept his femininity while not wanting to mutilate himself because he detests being male. He clarified that he is not requesting that the prison provide him with a sex change but that he will seek a sex change after he is released from prison and that his mother agreed to pay for it.

At the conclusion of the *Spears* hearing, the undersigned requested that the defense attorney provide: (1) the report from Dr. Cleveland on Gender Dysphoria; (2) RCC's Transgender Policy, (3) Information on the Intersex Treatment Plan; (4) Gage's medical records detailing the treatment of his attempted mutilation from August 28, 2020 to the present and (5)information on the denial of White's request for gender dysphoria. Rec. Doc. 17. The defendants' complied with the Judge's order and provided the necessary documents with the exception of the documents or report finding that he does not have gender dysphoria.

D. **RCC's Identification and Management of Intersex, Transgender and Offenders Diagnosed with Gender Dysphoria Policy**

RCC has a policy regarding the identity and treatment of intersex transgender and gender dysphoria ("GD"). According to RCC's policy, once an inmate identifies either upon entry or during incarceration as transgender, a treatment plan would be written up to address the inmates short-term and long-term goals and outcomes. The inmate would then be referred to a Mental Health Care Practitioner within three days of identifying as transgender. All offenders with a confirmed diagnosis of GD would have a treatment plan. If an offender upon intake advised that he was receiving gendering affirming care in the community, the facility would require release of pertinent medical and mental health records of the offender to confirm a diagnosis of GD before providing hormone treatment. If the inmate reported taking non-prescribed gender affirming hormones before incarceration, he would be referred for evaluation.

II. **Standards of Review**

Pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A and 42 U.S.C. § 1997e(c), the Court is required to *sua sponte* dismiss cases filed by prisoners proceeding *in forma pauperis* upon a determination that they are frivolous. The Court has broad discretion in determining the frivolous nature of the complaint. *See Cay v. Estelle*, 789 F.2d 318, 325 (5th Cir. 1986), *modified on other grounds, Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993). However, the Court may not *sua sponte* dismiss an action merely because of questionable legal theories or unlikely factual allegations in the complaint.

Under this statute, a claim is frivolous when it lacks an arguable basis either in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). "A [claim] lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not

exist." *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999) (quoting *Davis v. Scott*, 157 F.3d 882, 889 (5th Cir. 1998)). It lacks an arguable factual basis only if the facts alleged are "clearly baseless," a category encompassing fanciful, fantastic, and delusional allegations. *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992) (citing *Neitzke*, 490 U.S. at 327-28). Thus, the Court must determine whether plaintiff's claims are based on an indisputably meritless legal theory or clearly baseless factual allegations. *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir. 1994); *Jackson v. Vannoy*, 49 F.3d 175, 176-177 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992).

### III. Analysis

#### A. Denial of Hormone Therapy

White names the following people; Beverly Kelly, Dr. Graham Spriuell, Floyd Brooks, Doctor Robert Cleveland, Nurses Paula Stringer and Austin Seals, as being aware that he was at high risk of dysphoria and denied him both medical and mental health treatment. White sued the defendants for the violation of his Eighth Amendment right to adequate medical and mental health care. Rec. Doc. 18, p. 3. He contends during his incarceration he began identifying as transgender and experiences gender dysphoria which resulted in him attempting to mutilate himself on at least two occasions. He therefore contends that the prison has failed to provide him with mental health care associated with the incongruence of his physical and mental status. Therefore, he contends that the jail should be required to provide him with estrogen therapy which would aid in him adapting to the incongruence of how he feels compared to how he appears.

It is settled that the Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. *Id.* This circuit has worded the test as requiring extreme deprivation of any "minimal

civilized measure of life's necessities." *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998). Further, mental health needs are no less serious than physical needs. *Partridge v. Two Unknown Police Officers of City of Houston, Texas,* 791 F.2d 1182, 1187 (5th Cir.1986). The Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society" and not the standards in effect during the time of the drafting of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted). *See also Gates v. Cook,* 376 F.3d 323 (5th Cir. 2004)

The issue of transgender hormone treatment has been addressed by the Fifth Circuit in *Praylor v. Texas Department of Criminal Justice*, 430 F.3d 1208 (5th Cir. 2005). In *Praylor,* a transsexual state prison inmate brought suit, asserting that the denial of his request for hormone therapy to treat his transsexualism constituted cruel and unusual punishment under Eighth Amendment. *See Praylor*, 430 F.3d 1208. The Court in denying *Praylor's* request found that the inmate did not request any form of treatment other than hormone therapy, he had been evaluated for eligibility for hormone treatment twice, the prison provided mental health screening as part of its process, and that the inmate did not qualify for hormone therapy pursuant to the prisons policy for treating transsexuals. *Id*. at 1208. The Fifth Circuit therefore held that the denial of hormone therapy did not constitute deliberate indifference. It did not squarely address the issue of whether gender dysphoria was a serious medical condition.

Other appellate courts that have considered the issue have uniformly recognized gender dysphoria as a serious medical condition. *See De'Lonta v. Angelone*, 330 F.3d 630 (4th Cir.2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *Allard v. Gomez*, 9 Fed. Appx. 793, 794 (9th Cir. 2001); *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir. 1995); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987). Not a single decision, however, mandates hormone therapy. The manner of treatment is within the discretion

of the prison. *See Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997); *Brown*, 63 F.3d at 970; *White*, 849 F.2d at 327–328; *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986).

In this case, White upon entry into RCC appeared as male and declared his gender as male. According to White he declared that he was male because of fear of reprisal from other inmates. However, during his incarceration White began altering his prison clothing and engaging in same sex encounters at which point he declared that he was transgender and began the process of modifying his identity in prison. As a result, White began making attempts to secure hormone therapy to aid in his transition to becoming female. However, RCC denied his request on several occasions.

The record reflects that RCC has a policy regarding transgender inmates which requires an evaluation before the administration of hormone treatment. Although RCC was ordered to produce the report resulting in the finding that White does not have gender dysphoria; no such report was produced. Instead the defendant produced a memo prepared by Dr. Cleveland, who denies that White ever expressed any incongruency between how he appears and how he feels. Exhibit A, Dr. Cleveland Memo dated May 13, 2021. However, the Court has received a series of disciplinary requests and responses from prison officials regarding White's requests for evaluation for gender dysphoria. Rec.doc.29-4 In fact, the records show that after White's attempted mutilations, Dr. Cleveland was notified and instructed the medical staff to place him on extreme suicide watch and four-point restraints.

The documents produced also contradict Dr. Cleveland's current stance that White never expressed any transgender concerns or dysphoria to him. The records show that White wrote to Dr. Cleveland on October 12, 2020 requesting a transgender treatment plan and he was purportedly advised by Dr. Cleveland that he had to see an "outside doctor" when things opened up. On January 1, 2021, White wrote a letter inquiring why he was not being given hormone treatment.

White even wrote a letter to the PREA compliance manager regarding his treatment plan and was advised that he had a plan, but it was not due to be updated and that the decision to administer hormone therapy is solely a clinical decision.

White was even told by Floyd Brooks on February 17, 2021 that he was not entitled to hormone treatment because he had no such documentation of a prescription for hormone therapy upon intake at the facility. However, if an inmate took hormone pills without a prescription pre-incarceration, which White testified to doing, an evaluation was required.

Unlike in *Praylor* where the prison followed their policy on treating inmates who identify as transgender, here the Court cannot say that White has failed to state a claim for medical or mental indifference for which relief may be granted, because RCC seems to have not followed their policy and procedures. The documents appended to the Amended Complaint and the prison records provided by the order issued subsequent to the *Spears hearing* suggest that RCC may not have complied with its policy regarding the treatment of transgender inmates. For these reasons, White's claim against Floyd Brooks, Dr. Cleveland, Dr. Spruiell, and for their failure to give him hormone treatment are not frivolous and state a claim for which relief can be granted in accordance with § 1915, § 1915A and § 1997e.

### B. Inadequate Medical Care

White also named Nurse Stringer and Nurse Seals as parties to this case. He alleges that these nurses caused him to suffer needlessly after he attempted suicide and his attempted self-mutilation. Specifically, White alleges that Stringer and Seals refused to change his bandages for fourteen (14) consecutive days.

The United States Supreme Court has addressed the question of alleged inadequate medical care in jails and has determined that a constitutional violation for purposes of a §1983 claim occurs only when the conduct amounts to "deliberate indifference to [the prisoner's] serious medical

needs", "constitut[ing] the 'unnecessary and wanton infliction of pain.'" *Gamble*, 429 U.S. 104 (internal citation omitted) (quoting *Gregg v. Georgi*a, 428 U.S. 153, 182-83 (1976)). *Estelle* defined the "deliberate indifference" standard, explaining that a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety". *Id*. (emphasis added); *See also Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). The Fifth Circuit has repeatedly noted that deliberate indifference is an extremely high standard to meet. *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Disagreement with medical treatment is insufficient to state a claim of deliberate indifference. *See Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir.1991); *Gracia Ledezma v. United States,* 382 F. App'x 381, 383 (5th Cir. 2010) (dismissing claim for civil rights violations on Rule 12(b)(6) motion for failure to state a claim). Notably, delay in receiving medical treatment is actionable only where there is deliberate indifference and the delay results in substantial harm. *See Clark v. Gusman*, No. 11-2673, 2012 WL 1825306, *4 (E.D. La. Mar. 29, 2012) (three-week delay before seeing a doctor was not unreasonable for nonemergency care).

There is no question that Stringer and Seals knew that White engaged in self-mutilation. They were his caregivers. If the allegations against Stringer and Seals is true, White has stated a claim for deliberate indifference of his serious medical needs. He further alleges that the failure of his caregivers to clean his self- inflicted wound resulted in an infection and extended recovery time. The Court therefore finds that White has stated a claim for which relief may be granted against Stringer and Seals.

IV. <u>Recommendation</u>

It is therefore **RECOMMENDED** that Gaige Anthony White's § 1983 claims against defendants Nurse Paula Stringer, Director Floyd Brooks, Dr. Robert Cleveland, Dr. Graham

Spruiell, and Nurse Austin Seals be **ALLOWED TO PROCEED FORWARD** as they are not frivolous and for the reasons assigned.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[1]

New Orleans, Louisiana, this 6th day of January 2022.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**